**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WESTERN OKLAHOMA**

| | | |
|---|---|---|
| BRIAN LOOMIS, JASON BOYER and DANIEL W. KILDAY, individually and on behalf of all others similarly situated, | ) ) ) ) | **CIVIL ACTION NO.:** CIV-21-199-HE |
| Plaintiffs, | ) ) | |
| v. | ) ) | **CLASS ACTION COMPLAINT** |
| NEXTEP, INC., THE BOARD OF DIRECTORS OF NEXTEP, INC., THE INVESTMENT COMMITTEE OF NEXTEP, INC. and JOHN DOES 1-30. | ) ) ) ) ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiffs, Brian Loomis, Jason Boyer and Daniel W. Kilday ("Plaintiffs"), by and through their attorneys, on behalf of the Nextep 401(k) Retirement Savings Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Nextep, Inc. ("Nextep" or "Company") and the Board of Directors of Nextep, Inc. and its members during the Class Period[2] ("Board") and the Investment Committee of Nextep, Inc. and its members during the Class Period ("Committee") for breaches of their fiduciary duties.

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

[2] The Class Period, as will be discussed in more detail below, is defined as March 10, 2015 through the date of judgment.

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  These twin fiduciary duties are the highest known to law.  *See In re Williams Cos. ERISA Litig*., 271 F. Supp. 2d 1328, 1341(N.D. Okla. 2003) (noting ERISA's fiduciary duties are the highest known to the law.)

3.      "A central and fundamental obligation imposed on fiduciaries by ERISA is contained in Part 4, Title 1, § 404(a) [which] … embody a carefully tailored law of trusts, including the familiar requirements of undivided loyalty to beneficiaries, the prudent man rule, the rule requiring diversification of investments and the requirement that fiduciaries comply with the provisions of plan documents to the extent that they are not inconsistent with the Act." *Eaves v. Penn*, 587 F.2d 453, 457 (10th Cir. 1978).

4.      The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See, "A Look at 401(k) Plan Fees*," *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

6.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but

also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

7.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

8.      Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

9.      Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

10.      At all times during the Class Period (March 10, 2015 through the date of judgment) the Plan had at least 87 million dollars in assets under management. At the end of 2018 and 2019, the Plan had over 204 million dollars and 283 million dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries.

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

11.     The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

12.     Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories; and (3) failing to control the Plan's administrative and recordkeeping costs.

13.     It appears that in 2020, *five years* into the Class Period, some changes were made to the Plan wherein certain Plan investment options, some of which are the subject of this lawsuit, were either converted to lower class shares or eliminated unnecessary fees.

14.     These changes were far too little and too late as the damages suffered by Plan participants to that point had already been baked in.  There is no reason to not have implemented these changes by the start of the Class Period when the majority of lower-class shares were available.

15.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of

29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

16.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

18.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

19.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.     PARTIES

**Plaintiffs**

20.     Plaintiff, Brian Loomis ("Loomis"), resides in Norman, Oklahoma. During his employment, Plaintiff Loomis participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

21.     Plaintiff, Jason Boyer ("Boyer"), resides in Heathrow, Florida. During his employment, Plaintiff Boyer participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

22.     Plaintiff, Daniel W. Kilday ("Kilday"), resides in Austin, Texas. During his employment, Plaintiff Kilday participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

23.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

24.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available identical funds, and information regarding the availability and pricing of collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

25.     Nextep is the Plan sponsor and a named fiduciary with a principal place of business being 1800 N. Interstate Drive, Norman, Oklahoma 73072. The December 31, 2019 Form 5500

of the Nextep 401(k) Retirement Savings Plan filed with the United States Department of Labor ("2019 Form 5500") at 1.

26.     Nextep is a Professional Employer Organization or PEO. As detailed on Nextep's website: "[p]artnering with a PEO like Nextep can help businesses gain access to Fortune-500-style benefits, dedicated HR experts, and a robust suite of technology, all in a one-stop-shop, adding to major cost savings for your business.[4]"  Nextep offers retirement benefits to its clients and their employees by making them a participating employer under the Plan ("Participating Employer"). The Nextep 401(k) Retirement Savings Plan as amended and restated on September 23, 2015 ("Plan Doc.") at 148.  A client of Nextep becomes a Participating Employer by executing an adoption agreement under the Plan. *Id.*

27.     Nextep appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. Plan Doc. at 117. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

28.     Accordingly, the Company had a concomitant fiduciary duty to monitor and supervise those appointees.

29.     Accordingly, Nextep during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

---

[4] https://www.nextep.com/blog/how-a-peo-can-provide-more-financial-stability-for-your-business

30.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

31.     Nextep, acting through its Board of Directors, appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. Plan Doc. at 117. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

32.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

33.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

34.      As discussed above, the Committee is responsible for ensuring that the investments available to Plan participants are appropriate, have no more expense than reasonable and perform well as compared to their peers. Plan Doc. at 117. The IPS details the purported responsibilities of the Committee. The IPS establishes: "prudent procedures for monitoring and evaluating the performance of investments within the Plan; … ." IPS at 1. As will be discussed below, the Committee fell well short of these fiduciary goals.

35.     The IPS provides detail for these prudent procedures. The Committee must monitor plan costs and investment performance at least quarterly. IPS at 1. The Committee must select investments for the Plan "based on total expenses charged to the participants in the plan including but not limited to the net operating expense ratio, rule 12b-1, and sub transfer agent fees that may or may not be paid to any entity providing services to the Plan." IPS at 8. In addition to monitoring expenses, the Committee is also supposedly required to monitor the performance of each fund quarterly and replace any funds that underperform their peers. IPS at 6. Again, as will be discussed in more detail below, the Committee fell well short of these fiduciary goals.

36.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

37.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Non-Defendant Fiduciary
Envestnet Retirement Solutions**

38.     As described in the IPS, the Committee must select and monitor each investment option for performance and excessive fees with the assistance of such investment advisor as it may select. IPS at 3.  As detailed in the IPS, the Committee selected Envestnet Retirement Solutions to fulfill that responsibility. IPS at 1.

39.     According to Envestnet's website, Envestnet provides "a strict set of standards and a systematic process for investment selection and monitoring.[5]" In this case, the Committee's use

---

[5] https://envestnetrs.com/fiduciary-advantage last accessed on January 20, 2021.

of Envestnet's services failed to result in a menu of available funds that that were in the best interests of Plan participants.

40. Although Envestnet is a relevant party and has information relevant to this action, it is not named as a defendant given that Nextep, the Board and the Committee ultimately remain responsible for the selection and monitoring of all investment options. Nonetheless, Plaintiffs reserve the right to name Envestnet as a defendant in the future if deemed necessary.

### Additional John Doe Defendants

41. To the extent that there are additional officers, employees and/are contractors of Nextep who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Nextep officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

### IV. CLASS ACTION ALLEGATIONS

42. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[6]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between March 10, 2015 through the date of judgment (the "Class Period").

---

[6] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

43.     The members of the Class are so numerous that joinder of all members is impractical.  The 2019 Form 5500 lists 5,386 Plan "participants with account balances as of the end of the plan year."  2019 Form 5500 at 2.

44.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

45.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

     A.    Whether Defendants are/were fiduciaries of the Plan;

     B.    Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

     C.    Whether the Defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Plan was being managed in compliance with ERISA;

     D.    The proper form of equitable and injunctive relief; and

     E.    The proper measure of monetary relief.

46.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the

vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

47.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

48.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.     THE PLAN

49.     The Plan is a multiple employer plan or MEP. Plan Doc. at 148. Multiple-employer plans are typically used by outsourced human resource providers know as professional employer organizations or PEOs such as Nextep. Nextep offers the Plan to its clients as a means of attracting and retaining business. As stated on Nextep's website: "[p]artnering with a PEO like Nextep can help businesses gain access to Fortune-500-style benefits, dedicated HR experts, and a robust suite of technology, all in a one-stop-shop, adding to major cost savings for your business.[7]"

---

[7] https://www.nextep.com/blog/how-a-peo-can-provide-more-financial-stability-for-your-business last accessed on February 1, 2021.

50.     According to the American Institute of CPAs or AICPA, PEO's "provide a means by which an employer can outsource employee management tasks, such as payroll, employee benefits, workers' compensation, recruiting, risk/safety management, and training and development." AICPA Topix Primer Series, *Multiple Employer Retirement Plans and Multiple Employer Welfare Arrangements*, AICPA 2017[8] ("AICPA") at 1.  Where a MEP is offered by a PEO the "MEP is sponsored by the PEO and adopted by the PEO's clients." *Id.*  At its most basic level, a MEP is "a retirement plan that is adopted by two or more employers that are unrelated for income tax purposes." *Id.*

51.     Nextep established the Plan "to provide a retirement savings program for the employees of the Plan Sponsor." IPS at 8. In addition, Nextep offers retirement benefits to its clients and their employees by allowing them to become a participating employer under the Plan. Plan Doc. at 148. Further, the Plan must be "maintained for the exclusive purpose of benefiting the Plan participants." *Id.*

52.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Plan Doc. at 109.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.  *Id.*

*Eligibility*

---

[8] Available at:
https://www.aicpa.org/content/dam/aicpa/interestareas/employeebenefitplanauditquality/resources/ebpaqcprimers/downloadabledocuments/ebpaqc-multiple-employer-plans-primer.pdf last accessed on February 1, 2021.

53.     In general, regular full-time employees are eligible to participate in the Plan. The December 31, 2019 Report of the Independent Auditor of the Nextep 401(k) Retirement Savings Plan ("2019 Auditor Report") at 6. The 2019 Auditor Report states: "[t]he Plan is a multiple employer defined contribution profit sharing plan and trust with a qualified cash or deferred 401(k) arrangement covering all eligible employees of Nextep Holdings, LLC and Affiliated Entities (the 'Company') and its adopting employers" *Id.*

### *Contributions*

54.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. 2019 Auditor Report at 6.

55.     With regard to employee contributions, participants may "elect to defer a portion of their compensation up to 100%." *Id*. The Participating Employers' of Nextep may decide to make matching contributions to the Plan on behalf of their employees. As detailed in the 2019 Auditor Report: "[t]he participating employers may contribute a discretionary matching percentage to the Plan each year." *Id.*

56.     Like other companies that sponsor 401(k) plans for their employees, the participating employers in the Plan enjoy both direct and indirect benefits by providing matching contributions to Plan participants.  Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

57.     The participating employers also benefit in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

### *Vesting*

58.     Participants are immediately vested in their own contributions made to the Plan. Auditor Report at 6. Employees of Nextep and employees of Nextep's clients may be subject to a vesting schedule before any matching contributions made to the Plan are considered earned. Plan Doc. at 77. The election of a vesting schedule is made at the discretion of each Participating Employer. *Id.*

### *The Plan's Investments*

59.     In theory, the Committee responsibilities include selection and monitoring of the funds available for investment in the Plan.  IPS at 1.  The Committee must carry out this fiduciary responsibility for the exclusive benefit of the Plan Participants and Beneficiaries. IPS at 8.  But in practice, as alleged below, that is not what happened.

60.     Several funds were available to Plan participants for investment each year during the putative Class Period.  Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee. Plan Doc. at 110.

61.     The Plan's assets under management for all funds as of December 31, 2019 was $282,842,494.  2019 Auditor Report at 4.

### *Payment of Plan Expenses*

62.     During the Class Period, administrative expenses were paid for using Plan assets. As described in the Plan Document: "[a]ll reasonable expenses related to plan administration will be paid from Plan assets … ." Plan Doc. at 118.

**THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE**

63.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

64.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

65.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in the selection (and maintenance) of several funds in the Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs.

**B.      The Totality of Circumstances Demonstrate that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner**

**(1)      There Was Little to No Change in Plan Investment Options for the Entirety of the Class Period**

66.     One indication of Defendants' failure to prudently monitor the Plan's funds is that the Plan has retained many funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with identical, comparable and/or superior alternatives, and despite ample evidence available to a reasonable fiduciary that the costs associated with these funds were imprudently high. The following funds in the Plan stayed unchanged from 2015 to 2019:

| 2019 Funds | Years in the Plan |
|---|---|
| MassMutual RetireSMART by JP Morgan 2025 | Since 2015 |
| MassMutual RetireSMART by JP Morgan 2035 | Since 2015 |

| 2019 Funds | Years in the Plan |
|---|---|
| MassMutual RetireSMART by JP Morgan 2030 | Since 2015 |
| MassMutual RetireSMART by JP Morgan 2040 | Since 2015 |
| MassMutual RetireSMART by JP Morgan 2020 | Since 2015 |
| MassMutual RetireSMART by JP Morgan 2045 | Since 2015 |
| MassMutual RetireSMART by JP Morgan 2050 | Since 2015 |
| MassMutual RetireSMART by JP Morgan 2055 | Since 2015 |
| MassMutual RetireSMART by JP Morgan 2015 | Since 2015 |
| MassMutual RetireSMART by JP Morgan 2010 | Since 2015 |
| MM S&P 500 Index A | Since 2015 |
| Mass Mutual Select Growth OPPs | Since 2015 |
| MM S&P Mid Cap Index A | Since 2015 |
| MM Russell 2000 Sm Cap Index A | Since 2015 |
| Mass Mutual Select Mid Cap Growth A | Since 2015 |
| MM SSCI EAFE Intl Index A | Since 2015 |
| Invesco Comstock A | Since 2015 |
| MassMutual Select Strategy Bond A | Since 2015 |
| MassMutual Premier Core Bond A | Since 2015 |
| American Funds New World A | Since 2015 |
| MassMutual Premier Infi-Prot & Inc A | Since 2015 |
| MassMutual Select Sm Cap Gr Equity A | Since 2015 |
| American Funds Europacific Growth A | Since 2015 |
| American Funds Capital World Growth & Inc A | Since 2015 |
| Franklin Small Cap Value A | Since 2015 |
| Wells Fargo Special Mid Cap Value A | Since 2015 |
| MassMutual RetireSmart by JPM Ret A | Since 2015 |

67.     Out of the 29 funds in the Plan in 2019, 27 of them or 93%, remained unchanged since 2015.  Failure to remove or change imprudent funds to less expensive share classes or

17

cheaper cost structures over the course of several years is a clear indication that Defendants were not monitoring the Plan's funds as they should have been.

### (2)   Many of the Plan's Funds Had Investment Management Fees In Excess of Fees for Funds in Similarly-Sized Plans

68.     Another indication of Defendants' failure to prudently monitor the Plan's funds is that several funds during the Class Period were more expensive than comparable funds found in similarly sized plans (plans having between 100 million and 250 million in assets[9]).  The Plan grew from $106,808,999 to $185,364,288 in assets from 2016 to 2017. By the end of 2019, the Plan had $282,842,494 in assets.

69.     In 2019, all 29 funds in the Plan were more expensive than comparable funds found in similarly sized plans.  The expense ratios for funds in the Plan in some cases were up to ***211%*** (in the case of MassMutual RetireSMART by JP Morgan 2035) and up to ***180%*** (in the case of Mass Mutual Select Growth OPPs) above the median expense ratios in the same category: [10]

| ICI Median | | | |
|---|---|---|---|
| **2019 Funds** | **2020 ER** | **Category** | **ICI Median** |
| MassMutual RetireSMART by JP Morgan 2025 | 1.07% | Target Date | 0.36% |
| MassMutual RetireSMART by JP Morgan 2035 | 1.12% | Target Date | 0.36% |
| MassMutual RetireSMART by JP Morgan 2030 | 1.10% | Target Date | 0.36% |
| MassMutual RetireSMART by JP Morgan 2040 | 1.11% | Target Date | 0.36% |
| MassMutual RetireSMART by JP Morgan 2020 | 1.09% | Target Date | 0.36% |
| MassMutual RetireSMART by JP Morgan 2045 | 1.10% | Target Date | 0.36% |

---

[9] The Plan had over 100 million dollars in assets under management from 2016 to 2019. In 2015, the Plan dipped slightly below 100 million but because the Plan had over 100 million dollars for the majority of the Class Period, the Plan is categorized as having between 100 million and 250 million dollars in assets under management.

[10] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2017* at 55 (August 2020) (hereafter, "ICI Study") available at https://www.ici.org/pdf/20_ppr_dcplan_profile_401k.pdf

| ICI Median | | | |
|---|---|---|---|
| **2019 Funds** | **2020 ER** | **Category** | **ICI Median** |
| MassMutual RetireSMART by JP Morgan 2050 | 1.09% | Target Date | 0.36% |
| MassMutual RetireSMART by JP Morgan 2055 | 1.08% | Target Date | 0.36% |
| MM S&P 500 Index A | 0.72% | Domestic Equity | 0.51% |
| Mass Mutual Select Growth OPPs | 1.29% | Domestic Equity | 0.51% |
| MM S&P Mid Cap Index A | 0.76% | Domestic Equity | 0.51% |
| MM Russell 2000 Sm Cap Index A | 0.80% | Domestic Equity | 0.51% |
| Mass Mutual Select Mid Cap Growth A | 1.26% | Domestic Equity | 0.51% |
| MM SSCI EAFE Intl Index A | 0.85% | Domestic Equity | 0.51% |
| Invesco Comstock A | 0.81% | Domestic Equity | 0.51% |
| MassMutual Select Strategy Bond A | 1.02% | Domestic Bond | 0.44% |
| MassMutual Premier Core Bond A | 0.97% | Domestic Bond | 0.44% |
| American Funds New World A | 1.03% | Domestic Equity | 0.51% |
| MassMutual Premier Infi-Prot & Inc A | 1.03% | Domestic Bond | 0.44% |
| MassMutual Select Sm Cap Gr Equity A | 1.41% | Domestic Equity | 0.51% |
| American Funds Europacific Growth A | 0.83% | International Equity | 0.56% |
| American Funds Capital World Growth & Inc A | 0.76% | Domestic Equity | 0.51% |
| Franklin Small Cap Value A | 1.05% | Domestic Equity | 0.51% |
| Wells Fargo Special Mid Cap Value A | 1.16% | Domestic Equity | 0.51% |
| MassMutual RetireSmart by JPM Ret A | 1.10% | Target Date | 0.36% |
| Hartford Healthcare A | 1.28% | Domestic Equity | 0.51% |
| Blackrock Natural Resources Inv A | 1.19% | Domestic Equity | 0.51% |
| Loomis Sayles Strategic Income Fund | 0.96% | Domestic Equity | 0.51% |
| Oppenheimer Real Estate Fund | 1.34% | Domestic Equity | 0.51% |

70.    The high cost of the Plan's funds is even more stark when comparing the Plan's funds to the average fees of funds in similarly-sized plans:

| ICI Average | | | |
|---|---|---|---|
| **2019 Funds** | **2020 ER** | **Category** | **ICI Average** |
| MassMutual RetireSMART by JP Morgan 2025 | 1.07% | Target Date | 0.41% |
| MassMutual RetireSMART by JP Morgan 2035 | 1.12% | Target Date | 0.41% |
| MassMutual RetireSMART by JP Morgan 2030 | 1.10% | Target Date | 0.41% |
| MassMutual RetireSMART by JP Morgan 2040 | 1.11% | Target Date | 0.41% |
| MassMutual RetireSMART by JP Morgan 2020 | 1.09% | Target Date | 0.41% |
| MassMutual RetireSMART by JP Morgan 2045 | 1.10% | Target Date | 0.41% |
| MassMutual RetireSMART by JP Morgan 2050 | 1.09% | Target Date | 0.41% |
| MassMutual RetireSMART by JP Morgan 2055 | 1.08% | Target Date | 0.41% |
| MM S&P 500 Index A | 0.72% | Domestic Equity | 0.46% |
| Mass Mutual Select Growth OPPs | 1.29% | Domestic Equity | 0.46% |
| MM S&P Mid Cap Index A | 0.76% | Domestic Equity | 0.46% |
| MM Russell 2000 Sm Cap Index A | 0.80% | Domestic Equity | 0.46% |
| Mass Mutual Select Mid Cap Growth A | 1.26% | Domestic Equity | 0.46% |
| MM SSCI EAFE Intl Index A | 0.85% | Domestic Equity | 0.46% |
| Invesco Comstock A | 0.81% | Domestic Equity | 0.46% |
| MassMutual Select Strategy Bond A | 1.02% | Domestic Bond | 0.37% |
| MassMutual Premier Core Bond A | 0.97% | Domestic Bond | 0.37% |
| American Funds New World A | 1.03% | Domestic Equity | 0.46% |
| MassMutual Premier Infi-Prot & Inc A | 1.03% | Domestic Bond | 0.37% |
| MassMutual Select Sm Cap Gr Equity A | 1.41% | Domestic Equity | 0.46% |
| American Funds Europacific Growth A | 0.83% | International Equity | 0.58% |
| American Funds Capital World Growth & Inc A | 0.76% | Domestic Equity | 0.46% |
| Franklin Small Cap Value A | 1.05% | Domestic Equity | 0.46% |
| Wells Fargo Special Mid Cap Value A | 1.16% | Domestic Equity | 0.46% |
| MassMutual RetireSmart by JPM Ret A | 1.10% | Target Date | 0.41% |
| Hartford Healthcare A | 1.28% | Domestic Equity | 0.46% |
| Blackrock Natural Resources Inv A | 1.19% | Domestic Equity | 0.46% |
| Loomis Sayles Strategic Income Fund | 0.96% | Domestic Equity | 0.46% |

| ICI Average | | | |
|---|---|---|---|
| **2019 Funds** | **2020 ER** | **Category** | **ICI Average** |
| Oppenheimer Real Estate Fund | 1.34% | Domestic Equity | 0.46% |

71.     Although a good gauge of Defendants' imprudence, median-based and average-based comparisons still understate the excessiveness of the investment management fees of the Plan funds because many prudent alternative funds were available (which Defendants failed to consider) that offered lower expenses than the median and average fees.

> **(3)     Several of the Plan's Funds Were Not in the Lowest Fee Share Class Available to the Plan**

72.     Another fiduciary breach stemming from Defendants' flawed investment monitoring system resulted in the failure to identify available lower-cost share classes of many of the funds in the Plan during the Class Period.

73.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.  Because the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. *Tibble*, 2017 WL 3523737, at * 13.

74.     Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets. Qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds.  However, it is common knowledge that investment minimums are often waived for large plans like the Plan. *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24).

75.     Here, 26 of the 29 funds in the Plan or 89% of the funds in the Plan from 2015 to the end of 2019 were not in the lowest share class. In 2019, the total assets under management for

these funds was more than 259 million dollars thus easily qualifying them for lower share classes.

The following is a list of these funds and their assets under management as of the end of 2019:

| Current Fund | 2019 Assets Under Management |
|---|---|
| MassMutual RetireSMART by JP Morgan 2025 A | $29,389,396 |
| MassMutual RetireSMART by JP Morgan 2035 A | $27,727,611 |
| MassMutual RetireSMART by JP Morgan 2030 A | $23,689,909 |
| MassMutual RetireSMART by JP Morgan 2040 A | $21,563,500 |
| MassMutual RetireSMART by JP Morgan 2020 A | $19,874,453 |
| MassMutual RetireSMART by JP Morgan 2045 A | $15,774,646 |
| MassMutual RetireSMART by JP Morgan 2050 A | $11,075,669 |
| MassMutual RetireSMART by JP Morgan 2055 A | $8,133,828 |
| MM S&P 500 Index A | $29,142,022 |
| Mass Mutual Select Growth OPPs A | $8,020,260 |
| MM S&P Mid Cap Index A | $5,382,507 |
| MM Russell 2000 Sm Cap Index A | $5,720,608 |
| Mass Mutual Select Mid Cap Growth A | $5,286,048 |
| MM SSCI EAFE Intl Index A | $5,708,101 |
| Invesco Comstock A | $4,678,112 |
| MassMutual Select Strategy Bond A | $4,288,840 |
| MassMutual Premier Core Bond A | $4,486,599 |
| American Funds New World A | $3,100,773 |
| MassMutual Premier Infi-Prot & Inc A | $2,767,784 |
| MassMutual Select Sm Cap Gr Equity A | $3,335,809 |
| American Funds Europacific Growth A | $2,631,791 |
| American Funds Capital World Growth & Inc A | $2,380,579 |
| Franklin Small Cap Value A | $2,136,825 |
| Wells Fargo Special Mid Cap Value A | $2,332,188 |
| Hartford Healthcare A | $1,534,524 |
| MassMutual RetireSmart by JPM Ret A | $8,927,088 |
| Total: | $259,089,470 |

76.    In several instances during the Class Period, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds.

77.    The below chart uses 2020 expense ratios to demonstrate cost differentials between the applicable mutual funds and the cheaper identical shares:

| Current Fund | ER | Lower Class Fund | ER | Excess Fee % |
|---|---|---|---|---|
| MassMutual RetireSMART by JP Morgan 2025 A | 1.07% | MassMutual RetireSMART by JP Morgan 2025 I | 0.52% | 106% |
| MassMutual RetireSMART by JP Morgan 2035 A | 1.12% | MassMutual RetireSMART by JP Morgan 2035 I | 0.57% | 96% |
| MassMutual RetireSMART by JP Morgan 2030 A | 1.10% | MassMutual RetireSMART by JP Morgan 2030 I | 0.55% | 100% |
| MassMutual RetireSMART by JP Morgan 2040 A | 1.11% | MassMutual RetireSMART by JP Morgan 2040 I | 0.56% | 98% |
| MassMutual RetireSMART by JP Morgan 2020 A | 1.09% | MassMutual RetireSMART by JP Morgan 2020 I | 0.54% | 102% |
| MassMutual RetireSMART by JP Morgan 2045 A | 1.10% | MassMutual RetireSMART by JP Morgan 2045 I | 0.55% | 100% |
| MassMutual RetireSMART by JP Morgan 2050 A | 1.09% | MassMutual RetireSMART by JP Morgan 2050 I | 0.54% | 102% |
| MassMutual RetireSMART by JP Morgan 2055 A | 1.08% | MassMutual RetireSMART by JP Morgan 2055 I | 0.53% | 104% |
| MM S&P 500 Index A | 0.72% | MM S&P 500 Index I | 0.12% | 500% |
| Mass Mutual Select Growth OPPs A | 1.29% | Mass Mutual Select Growth OPPs I | 0.74% | 74% |
| MM S&P Mid Cap Index A | 0.76% | MM S&P Mid Cap Index I | 0.16% | 375% |
| MM Russell 2000 Sm Cap Index A | 0.80% | MM Russell 2000 Sm Cap Index I | 0.20% | 300% |

| Current Fund | ER | Lower Class Fund | ER | Excess Fee % |
|---|---|---|---|---|
| Mass Mutual Select Mid Cap Growth A | 1.26% | Mass Mutual Select Mid Cap Growth I | 0.71% | 77% |
| MM SSCI EAFE Intl Index A | 0.85% | MM SSCI EAFE Intl Index I | 0.25% | 240% |
| Invesco Comstock A | 0.81% | Invesco Comstock R6 | 0.40% | 103% |
| MassMutual Select Strategy Bond A | 1.02% | MassMutual Select Strategy Bond I | 0.47% | 117% |
| MassMutual Premier Core Bond A | 0.97% | MassMutual Premier Core Bond I | 0.42% | 131% |
| American Funds New World A | 1.03% | American Funds New World R6 | 0.60% | 72% |
| MassMutual Premier Infi-Prot & Inc A | 1.03% | MassMutual Premier Infi-Prot & Inc I | 0.48% | 115% |
| MassMutual Select Sm Cap Gr Equity A | 1.41% | MassMutual Select Sm Cap Gr Equity I | 0.86% | 64% |
| American Funds Europacific Growth A | 0.83% | American Funds Europacific Growth R6 | 0.49% | 69% |
| American Funds Capital World Growth & Inc A | 0.76% | American Funds Capital World Growth & Inc F3 | 0.44% | 73% |
| Franklin Small Cap Value A | 1.05% | Franklin Small Cap Value R6 | 0.62% | 69% |
| Wells Fargo Special Mid Cap Value A | 1.16% | Wells Fargo Special Mid Cap Value R6 | 0.73% | 59% |
| Hartford Healthcare A | 1.28% | Hartford Healthcare Y | 0.96% | 33% |
| MassMutual RetireSmart by JPM Ret A | 1.10% | MassMutual RetireSmart by JPM Ret I | 0.55% | 100% |

78.     The above is for illustrative purposes only.  At all times during the Class Period,

Defendants knew or should have known of the existence of cheaper share classes and therefore

also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

79.     There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment.  Because the more expensive share classes chosen by Defendants were the same in every respect other than price to their less expensive counterparts, the more expensive share class funds ***could not have*** (1) a potential for higher return, (2) lower financial risk, (3) more services offered, (4) or greater management flexibility.  In short, the Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

80.     In other words, given the size of the Plan, Defendants made investments with higher costs (higher expense ratios) available to participants while the same investments with lower costs (lower expense ratios) were available to the detriment of the compounding returns that participants should have received.  This reduced the likelihood that Plan participants would achieve their preferred lifestyle in retirement.

### (4)   The Plan's Recordkeeping and Administrative Costs Were Excessive During the Class Period

81.     Another result of Defendants' imprudent process was the excessive recordkeeping and administrative fees Plan participants were required to pay during the Class Period.

82.     Long-standing DOL guidance explicitly states that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting … service providers" and "monitor … service providers once selected to see that they continue to be appropriate choices."  *See, "A Look at 401(k) Plan Fees," supra,* at n.3.

83.     The Restatement of Trusts also puts cost-conscious management above all else while administering a retirement plan.  *Tibble,* 843 F.3d at 1197-98.

84.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

85.    Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants.  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive."  Justin Pritchard, "Revenue Sharing and Invisible Fees" available at   http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020).

86.    In this matter, using revenue sharing to pay for recordkeeping resulted in a worst-case scenario for the Plan's participants because it saddled Plan participants with above-market recordkeeping fees. For example, looking at the combined amount of direct and indirect compensation paid to Nextep, Massachusetts Mutual Life Insurance Company and MML Investor Services as reported on the Plan's 2019 5500 shows that the Plan was paying at least $138 per participant in administrative and recordkeeping costs. In 2018, the per participant costs were even higher, being at least $175 per participant.

87.    By way of comparison, we can look at what other plans paid for recordkeeping and administrative costs during the same time period.

88.     The Plan had, conservatively, between 1,000 and 5,000 participants making it eligible for some of the lowest fees on the market.

89.     NEPC, a consulting group, which recently conducted its 14th Annual Survey titled the NEPC 2019 Defined Contribution Progress Report, which took a survey of various defined contribution plan fees.[11]   The sample size and respondents included 121 Defined Contribution Plans broken up as follows: 71% Corporate; 20% Healthcare, and 9% Public, Not-for-Profit and other.  The average plan had $1.1 billion in assets and 12,437 participants.  The median plan had $512 million in assets and 5,440 participants.  *See,* Report at 1.

90.     NEPC's survey found that the majority of plans with between 1,000 and 5,000 participants paid slightly over $70 per participant recordkeeping, trust and custody fees.  Report at 10.  ***No plan*** with between 1,000 and 5,000 participants paid more than $78 per participant for recordkeeping.  *Id.*

91.     Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

92.     Additionally, because Plan participants were paying more for recordkeeping than they should have as a result of the Plan fiduciaries' conduct, this confirms that the use of higher-cost share classes cannot be justified as a prudent means to pay recordkeeping and administrative costs.

93.     By failing to investigate the availability of certain identical lower share classes of the same funds, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

---

[11] Available at https://www.nepc.com/insights/2019-dc-plan-and-fee-survey.

94.     Moreover, because a significant amount of the recordkeeping and administrative fees were paid for by forfeiture accounts there was no need to use revenue sharing from the Plan's investments to pay for recordkeeping and administrative fees.  But there is no indication that the Plan's fiduciaries returned the revenue sharing collected from the Plan's investments back to the Plan's participants as they should have.

95.     Indeed, the Plan's fiduciaries acknowledge their imprudent conduct by switching some of the Plan's funds during 2020 to funds that had no revenue sharing attached to them.

96.     By failing to investigate the use of lower cost share classes, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.  Further, to the extent Defendants failed to return revenue sharing amounts back to Plan participants, this was a further fiduciary breach that cost Plan participants.

## FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duty of Prudence
### (Asserted against the Committee)

97.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

98.     At all relevant times, the Committee Defendants and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

99.     As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent

person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

100.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of the Plan's participants.  Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments.  The Prudence Defendants also failed to control the administrative and recordkeeping expenses of the Plan and to investigate the availability of lower-cost identical products of certain mutual funds.

101.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

102.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

103.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against the Board and Nextep)**

104.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

105.    The Board Defendants and Nextep (the "Monitoring Defendants") had the authority and obligation to monitor the Committee and was aware that the Committee had critical responsibilities as a fiduciary of the Plan.

106.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee and ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

107.    The Monitoring Defendants also had a duty to ensure that the Committee possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

108.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)    Failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions;

(b)    failing to monitor the processes by which the Plan's investments were evaluated and the Committee's failure to investigate the availability of identical lower-cost funds; and

(c)     failing to remove the Committee as a fiduciary whose performance was inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and the retirement savings of the Plan's participants.

109.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and participants of the Plan would have had more money available to them for their retirement.

110.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Date: March 10, 2021                          **CAPOZZI ADLER, P.C.**

/s/ Donald R. Reavey              .
Donald R. Reavey, Esquire
PA Attorney ID #82498
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com
(717) 233-4101
Fax (717) 233-4103

/s/ Mark K. Gyandoh            .
Mark K. Gyandoh, Esquire
PA Attorney ID # 88587
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
(610) 890-0200
Fax (717) 233-4103

Counsel for Plaintiffs and the Putative Class